SANDUSKY PORTLAND CEMENT CO. v. DIXON PURE ICE CO.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1918.)

No. 2475.

1. WATERS AND WATER COURSES ⟨⟩297—ICE—INJURIES TO—MEASURE OF DAMAGES.

Where the owner of ice fields sought to recover because an upper riparian owner discharged hot water into the river, which melted his ice, *held*, that the yearly damages could not be determined by ascertaining the net value of a ton of ice harvested and multiplying this sum by the total ice tonnage in the field, less the amount actually harvested, for the amount harvested would depend on the owner's facilities, etc.

2. WATERS AND WATER COURSES ⟨⟩297—ICE—INJURIES TO—MEASURE OF DAMAGES.

Where the owner of ice fields sought to recover because an upper riparian proprietor discharged hot water into the river and melted the ice, *held*, that the lessened rental value of the property occasioned by hot water being emptied into the river was not an applicable measure of damages.

3. DAMAGES ⟨⟩62(3)—ICE—MEASURE OF DAMAGES.

Where an upper proprietor discharged hot water into a stream, so that it melted the ice and injured the property of the owner of the lower ice fields, *held*, that the owner of such fields was not bound, for the purpose of minimizing its damages, to make a pontoon bridge across the open space in the field melted by the water.

4. WATERS AND WATER COURSES ⟨⟩297—ICE—INJURIES TO—MEASURE OF DAMAGES.

Where an upper proprietor discharged hot water, which melted the ice in a stream and injured a lower proprietor, who owned the ice fields, *held*, that the damages of the owner of such ice fields should be computed on the difference in value of the amount of ice which the owner might have harvested and the amount which it actually harvested.

In Error to the District Court of the United States for the Western Division of the Northern District of Illinois.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by the Dixon Pure Ice Company against the Sandusky Portland Cement Company. There was a judgment for plaintiff, and defendant brings error. Modified and affirmed.

Suit to restrain future trespasses and to recover damages for past trespasses committed by appellant, a corporation engaged in manufacturing cement and owning land and operating its factory thereon at a point near Dixon, Ill., on the Rock river, and just above appellee's ice fields. Appellee's rights were established by the decree of this court on a previous appeal. 221 Fed. 200, 136 C. C. A. 610, L. R. A. 1915E, 1210. The only question for consideration is one of damages.

William H. Burges, of Chicago, Ill., and E. H. Brewster, of Dixon, Ill., for plaintiff in error.

Clyde Smith, of Dixon, Ill., for defendant in error.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Such widely differing rules of damages are urged by the parties to this litigation that a statement of details is necessary. Appellee secured control of the ice fields and the icehouses a short distance below Dixon in 1905, and operated its business since that date to the day of the trial. Its location is advantageous, but it appears that ice seasons in this vicinity are uncertain and variable. Uncertainty attends the business, both as to the quantity and quality of the ice, and the length of the season during which the merchantable ice may be harvested. Appellant's manufacturing plant, located just above the ice fields, required the use of heated water, which was secured from and emptied into the Rock river, and which heated water followed the channel of the river and entered the ice fields before entirely cooling. The channel thus affected was near the center of the stream, and the cut-off portion of the pond, it was contended, contained the best ice. This channel, varying somewhat in width, was at times entirely open, while at other times the ice forming thereon was so thin as to render travel across the stream dangerous or impossible.

Many interesting statistics are presented, tending to establish the amount of damages on various theories, and nearly every possible theory for computing such damages has been advanced. No warm water was turned into the stream or affected the ice business during any of the seasons of 1905–06, 1906–07, 1907–08, 1911–12, 1913–14, and 1915–16. Appellant turned its hot water into the river during each of the other five years, to appellee's damage. No allowance for damages is made for the season of 1913–14, because no damages traceable to appellant's conduct is shown. Appellant turned no warm water into the river in this year after February 11th. No ice had been put up prior to this date. None had formed in or outside the channel of sufficient thickness to justify its harvest. In a few hours, at most, the influence of the heated water previously poured into the river would have disappeared. The cold and ice-forming weather occurred shortly thereafter, and on February 16th appellee began cutting its ice, and continued until February 28th, without interference from appellant. These 12 days completed its season. Appellee's superintendent frankly admits: "No trouble with hot water was experienced this season."

The total amount of ice housed and shipped out of the city and the profit or loss of appellee's business appears from the following table:

|           | Year. | Amount Housed. | Amount Shipped. | Total. | Profit or Loss. | |
|-----------|-------|----------------|-----------------|--------|-----------------|---|
|           | 1905-6 | 4600 | 548 | 5148 | Profit | $4660.62 |
|           | 1906-7 | 3000 | 614 | 3614 | Loss | 1562.32 |
|           | 1907-8 | 6000 | 3733 | 9733 | Profit | 921.92 |
| Hot Water | 1908-9 | 2000 | 1966 | 3966 | Loss | 1715.04 |
| Hot Water | 1909-10 | 9300 | 2091 | 11391 | Loss | 3433.08 |
| Hot Water | 1910-11 | 9300 | 5655 | 14955 | Profit | 8829.74 |
|           | 1911-12 | 10950 | 6031 | 16981 | Loss | 1137.74 |
| Hot Water | 1912-13 | 2500 | 1684 | 4184 | Profit | 2333.49 |
|           | 1913-14 | 1800 | 3827 | 5627 | Profit | 423.37 |
| Hot Water | 1914-15 | 1400 | 5625 | 7025 | Loss | 164.24 |
|           | 1915-16 | 1000 | 670 | 1670 | Not Known | |

Appellee introduced proof tending to establish the length of the season, the depth of the ice, and the value per ton of the ice, from which we prepare the following table:

| Season. | Average Thickness of Ice. | Length of the Harvest Season, Number of Days on Which Ice Could Have Been Harvested. | Net Value per Ton. |
|---------|---------------------------|-------------------------------------------------------------------------------------|--------------------|
| 1908-9 | 11 in. | 13 | 18.5 cents |
| 1909-10 | 12 in. | 49 | 18.5 cents |
| 1910-11 | 11 in. | 34 | 17.0 cents |
| 1912-13 | 11 in. | 26 | 23.5 cents |
| 1913-14 | 12 in. | 12 | 23.5 cents |
| 1914-15 | 11 in. | 25 | 22.0 cents |

It was claimed that in normal years the field held about 125,000 tons of ice. A careful study of all the figures justifies the conclusion that the average per day capacity of appellee's plant was 470 tons. These figures are reached by taking appellee's statistics, showing total harvest and the number of days actually devoted to harvesting the crop, covering a period of six years.

[1] Appellee contends that the damages each year may be determined by ascertaining the net value of a ton of ice harvested and multiplying this sum by the total ice tonnage in the field in any season, less the amount actually harvested during such season. It is apparent at once that such a contention must be rejected, because of its failure to take into consideration the length of the season, thickness of the ice, demand for product, ability to house or care for the entire tonnage, and other important factors. Assuming the average annual tonnage in the field, when unaffected by appellant's hot water, to be 125,000 tons, the injustice of applying the rule contended for by appellee is at once apparent, when we examine the above tables. The largest tonnage ever harvested was less than 17,000 tons. The capacity of appellee's icehouses was 10,500 tons. During the entire six years from

1905 to 1915, when no heated water whatever affected appellee's business, the total tonnage harvested was only 42,770 tons. More than this, it appears that appellee, in order to have harvested the entire 125,000 tons, would have been required in some seasons to harvest over 9,000 tons per day. This rule of damages is therefore rejected.

[2] Appellant, on the other hand, advances in the alternative several rules for measuring the damages in this case. It contends that the differences in the rental value of appellee's property, occasioned by the hot water being emptied into the river, represents the true and correct measure of damages. Whether such difference in rental value of an ice field may ever be safely adopted as a correct rule of damages we need not determine. In view of the facts in this case, we are certain such a rule would be inapplicable and unjust.

[3] Appellant submits as the second rule that appellee was required to keep its loss at the lowest possible point and to do so should have built a pontoon bridge across the channel (which it asserts could have been built at a cost of $465), and the part of the field south of the channel could then have been harvested. The value of the small amount of ice, represented by the few feet of the channel, impaired by the hot water, could be separately determined and added to the cost of the pontoon bridge.

The rule which requires the aggrieved party to keep its loss to the lowest possible figure, while enforced by the courts wherever practicable, should not be enforced in a case like the present. In order to reduce its loss, appellee was not required to so increase the hazards of its business as to endanger the life of any of its employés. The uncertainty surrounding its business, as well as the uncertainty connected with the appellant's trespassing, furnishes added reason why this rule of damages should not be applied. Chicago Bonding & Surety Co. v. Augusta-Savannah Navigation Co., 250 Fed. 616, —— C. C. A. ——, decided by this court at this term.

[4] A third rule advanced by appellant as a possible measure of damages in this case meets with our approval and appeals to us as just and fair. It tends to eliminate speculative damages, and yet fully compensates appellee. This rule requires us to consider the average daily capacity of appellee's plant, and the number of days in the ice-harvesting season. We may then determine the annual capacity of appellee's plant. We have concluded to limit the total tonnage in a single year to the largest yield appellee was able to show in its history. The largest harvest was during the season of 1911–12, when appellee was unvexed by any hot water, when the ice was one inch thicker than during any other year covered by this entire period, and the ice season was the longest and most favorable to a big yield. In fixing this maximum, we also take into consideration the fact that appellee's housing capacity was but 10,500 tons, while the outside demand never equaled in any other year the amount sold during this season of 1911–12.

Assuming the average daily capacity of the plant to be 470 tons and the average value of a ton of ice to be 18 cents, and limiting the total capacity for any season to 16,981 tons, the result becomes a mere mat-

ter of computation. The following table furnishes the basis for our decree:

| Year. | Days of Harvesting Season. | Tonnage Harvested. | Tonnage That Might Have Been Harvested. | Tons Lost. |
|---|---|---|---|---|
| 1908-9 | 13 | 3966 | 6110 | 2114 |
| 1909-10 | 49 | 11391 | 16981 | 5590 |
| 1910-11 | 34 | 14955 | 16981 | 2036 |
| 1912-13 | 26 | 4184 | 12220 | 7036 |
| 1914-15 | 25 | 7025 | 11750 | 4725 |
|  |  |  |  | 21501 |

This total tonnage, figured at 18 cents per ton, produces a total damage of $3,870.18. We see no reason why interest should not be allowed from March 1, 1915, at 5 per cent. The use of the average in determining quantities, price, etc., as the basis for the computation, makes it impossible for the court to allow interest prior to this date.

The decree, which was for a sum considerably larger, is modified, so that appellee is awarded the sum of $3,870.18, together with interest at 5 per cent. from March 1, 1915, besides the costs and disbursements of this action in the lower court. So modified, the decree is affirmed. Appellant is to recover its costs in this court.